Karl G. Anuta, Esq.
Law Office of Karl G. Anuta, PC
735 S.W. First Ave., Second Floor
Portland, OR 97204
Phone (503) 827-0320
Fax (503) 228-6551
kga@integra.net

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### (Portland Division)

| | |
|---|---|
| CLATSOP RESIDENTS AGAINST WALMART (CRAW), and unincorporated association, and SARA MEYER, an individual<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, a federal agency, and SHAWN ZINSZER, in his official capacity as Chief of the Corps Portland District Regulatory Branch,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Environmental Litigation (National Environmental Policy Act & Clean Water Act) |

## SUMMARY

1.

This case is about the errors made by the U.S. Army Corps of Engineers

("Corps"), a federal agency, when they improperly authorized Wal-Mart Corporation,

(acting via a third party surrogate Peaksview, LLC), to fill a wetland complex that

1 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

includes wetlands previously deemed locally "significant" by the City of Warrenton, and wetlands previously relied on as mitigation for a nearby wetland fill, in order to build a highly visible Wal-Mart retail store adjacent to Highway 101.  This proposal is hereafter referred to as the "Project".

2.

Specifically, this suit seeks judicial review of the Corps' Decision Notice ("DN") approving Wal-Mart's permit application (NWP-2007-1024-1) pursuant to Section 404 of the Clean Water Act ("Clean Water Act").  It also seeks judicial review of the Corps'-Environmental Impact Analysis and Finding of No Significant Impact ("FONSI"), dated September 5, 2014, which underpins the challenged permit approval. This action challenges the findings, assumptions, and conclusions contained in those documents based on the Corps' obligations under the Administrative Procedure Act ("APA"), (5 U.S.C. §§ 701 *et seq.*), the Clean Water Act ("CWA"), (33 U.S.C. §§ 1251 *et seq.)*, and the National Environmental Policy Act ("NEPA"), (42 U.S.C. §§ 4231 *et seq.)*.

3.

The Corps obligations include protection of aquatic resources, protection of the quality of the human environment, and protection of the robustness of the administrative and environmental permitting review process.  In this instance the DN, FONSI, and supporting documents, including an Environmental Assessment ("EA"), fail to properly assess the environmental impacts of and the available alternatives to the proposed project.  They also fail to account for the cumulative impacts, to already reduced wetlands and a former stream.

2 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4.

The Project is sited within a wetland complex and former creek or stream that has been reduced by prior permitted fills.  The Corps authorized the fill of additional wetlands on the site to facilitate the construction of the retail store, by a large out of state corporation.  The company (WalMart) ruled out a number of alternative development sites, without sufficient examination and analysis.  The Corps, unfortunately, accepted the WalMart analysis without taking it's required "hard look" at the facts and options.

5.

The Project site potentially affects an aquatic network reaching from the threatened wetlands complex (which was formally a creek) and down to the Skipanon River, a key component of the Lower Columbia River Estuary. The wetlands discharge into a tributary of the Skipanon River, part of a water network that provides important habitat for salmonids and other wildlife.

6.

Plaintiff Clatsop Residents Against Walmart (CRAW) is a local unincorporated organization comprised of individuals and businesses who live, work, recreate, do business, and/own own property, in and around the area of the proposed project site. Plaintiff Meyer is a local business owner, who lives, works, recreates, and owns property in the area.

7.

Plaintiffs challenge the actions of the Corps on grounds that the agency failed to conduct an adequate comprehensive environmental analysis, and failed to provide a

thorough and independent review of project is alleged benefits, as costs, and the alternatives to the project, as required by law.  Plaintiffs seek a declaration that the Corps permiting decisions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA § 706(2)(A).  Plaintiffs request that the Court set aside and remand permit NWP-2007-1024-1.

## II.  JURISDICTION

8.

The court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1346 (United States as a defendant).  Plaintiff's claims arise under the APA, 5 U.S.C. §§ 701 *et seq.*, the CWA, 33 U.S.C. §§ 1251 *et seq.*, and NEPA, 42 U.S.C. §§ 4231 *et seq.*  There is a present, actual, and justiciable controversy between the parties.  The relief sought is appropriate under 28 U.S.C. §§ 2201 (declaratory relief), 28 U.S.C. §§ 2202 (injunctive relief), and 5 U.S.C. §§ 701–706 (APA).

9.

The challenged agency action is subject to this Court's review under the APA, 5 U.S.C. §§ 702, 704, and 706.  The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## III.  VENUE

10.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).  All or a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.  Defendant U.S. Army Corps' and defendant Zinszer's offices

4 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

responsible for the acts giving rise to this cause of action are in Multnomah County, and the Project's proposed location is in  Warrenton, Clatsop County, Oregon.  Plaintiff Meyer resides in Clatsop County.  Plaintiff CRAW is based in Clatsop County and has most of its members there.

## IV.  PARTIES

11.

The defendants are U.S. Army Corps of Engineers ("Corps") and the Corps' Portland District Regulatory Chief Shawn Zinszer.  Defendant United States Army Corps of Engineers ("Corps") is the agency of the Federal government.  The Corps has a duty to evaluate applications for wetland fill permits under section 404 of the CWA.  The Corps also have a duty to ensure that the requirements of the NEPA are fulfilled in connection with all evaluation and decision-making concerning such permits.  The Corps has a District Office in Portland, Oregon.

12.

Plaintiff CRAW is a coalition of  local individuals and businesses who are concerned about the potential effects of a Wal-Mart in Warrenton. CRAW has been an active participant in the permitting process. Plaintiff Meyer is an active member of CRAW.  Plaintiffs have provided extensive information to the Corps' on the project, in the form of multiple public comments.  Plaintiffs have maintained throughout the proceedings that the proposed project will harm the area at issue, by disturbing the ecology the area, including a wetland complex that feeds the Skipanon River, and by altering the character of the Warrenton area in a permanent, significant way.

5 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

13.

Plaintiffs have also raised concerns about the environmental, aesthetic, educational, recreational, financial, scientific, and health consequences of Wal-Mart development at this site.  Plaintiffs have raised concerns about the consequences to the businesses, individuals, animals, wetlands and other activities in the area.   Plaintiffs are concerned about the ongoing operation of a project, whose execution will result in a significant increase in traffic from delivery trucks and thousands of shoppers; which will result in both additional pollution, and additional wetland filling; and a project where the traffic will potentially ensnarl the area around Highway 101. Plaintiffs are also concerned about negative outcomes to the community stemming from Wal-Mart's business model, which will potentially drive out small, local businesses, damaging the character of Warrenton while taking profits away from those in the local community and sending them to another stat far away. In addition, Plaintiffs are concerned about the direct, indirect, and cumulative effects that the construction, and operation of a Wal-Mart Super Center on this site will have on the Skipanon River, wetlands in the area, and local culture.

14.

Plaintiffs have submitted lengthy comments about the wetland and stormwater impacts of the Project.  Plaintiffs also dispute that the claimed public "benefits" of the Project, when weighed against the substantial threats to local businesses, (including those owned by CRAW members) will be at all balanced or positive to the public. Plaintiffs further question the independence of the data used in the application process, the lack of flexibility shown by the Corps in the consideration of alternatives, and the lack of agency adherence within these proceedings to the clear purposes and

requirements of federal law.

15.

Plaintiff's' use and enjoyment of the Skipanon River and the surrounding area will be potentially impaired, and adversely affected by the proposed Project, given its position next to Highway 101 and on top of a former creek and current wetland. The development of the area will potentially further degrade water quality in the Skipanon River. It will likely diminish aesthetic values. It will potentially endanger fish, and wildlife that inhabit the lands and waters effected by the Project, and it will hinder the ability of plaintiffs to enjoy the environment and community.

16.

Plaintiffs' potential injuries are directly traceable to the Corps violations of the law and the legal consequences flowing from those violations.  The legally deficient analysis of the Project's impacts on and relation to the wetlands at issue allows the Project to move forward.  Unless this Court grants the requested relief, the environmental, aesthetic, and educational, recreational, financial, scientific, and health interests of one or both plaintiffs will be adversely, and irreparably harmed by the Project.  An Order compelling the Corps to properly review the proposed Project consistent with the CWA and NEPA will be more protective of water quality, human health and safety, and animals, and plant species, and would potentially redress Plaintiff's injuries.

## V.  LEGAL BACKGROUND

### A.      Administrative Procedure Act

17.

The APA, 5 U.S.C. §§ 702 *et seq.*, confers a right of judicial review on any

person or location adversely affected by agency action.  Pursuant APA § 706(2)(A) and (D), a court shall set aside and hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

18.

Neither NEPA nor the CWA contain a standard of review.  Consequently, claims under these laws are reviewed under the APA.  Pursuant to APA § 704, final agency actions under these statutes are subject to judicial review.

**B.    Clean Water Act**

19.

Congress passed the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, with several distinct and unambiguous purposes--an essential theme of the law is the protection of the "integrity" (chemical, physical, and biological) of the Nation's waters. This definite Congressional purpose is expressed in Section 101 of the Act, 33 § 1251. The Act also states as a "national goal" to attain water quality sufficient to protect fish, wildlife, and shellfish, and to encourage recreation.

20.

To obtain these objectives, Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into the waters of the United States without a permit.  According to the CWA § 1362(6), the term "pollutant" includes solid waste, sewage, chemical wastes, biological materials, rock, and sand.  CWA implementing regulations at 40 C.F.R. § 232.2 define the term "waters of the United States" to include wetlands.

21.

Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met.  The Section 404 permitting program is administered by the Corps, whose authority exists in cooperation with that of the Environmental Protection Agency ("EPA").  Unless exempted by Section 404(f)(1) in circumstances not relevant to this action, all discharges of dredged or fill material into waters of the United States, including wetlands, must be authorized under a Section 404 permit issued by the Corps.

22.

In reviewing a Section 404 permit application, the Corps must follow rules jointly promulgated by the EPA and the Corps.  These rules are known as the "404(b)(1) Guidelines" and are codified at 40 C.F.R. Part 230.  All requirements in § 230.10 must be met before a permit may issue. The Corps is also instructed by law to follow General Policies in evaluating permit applications as outlined in 33 C.F.R. Part 320 and are bound by associated regulations.

23.

The 404(b)(1) Guidelines require meaningful consideration of alternatives in permiting decisions affecting wetlands or other special aquatic sites. Pursuant to 40 C.F.R. § 230.12(a)(3), the Corps is prohibited from issuing a permit if:

(i)     There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(ii)    The proposed discharge will result in significant degradation of the aquatic ecosystem; or

9 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

  (iii)  The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

  (iv)  There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Guidelines.

24.

When a party seeks a permit for an activity whose basic purpose does not require aquatic proximity (i.e. the activity is not "water dependent") the Corps must **presume** practicable alternatives are available, unless an absence of such alternative is clearly demonstrated.  In addition, where a project involving discharge is proposed for a special aquatic site like a wetland, all practicable alternatives which do *not* involve a discharge into a special aquatic site are presumed to have less impact on the aquatic ecosystem than the original unless there is a clear demonstration to the contrary.

25.

According to the 404(b)(1) Guidelines, an alternative to discharge into a wetland is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall original project purposes.  This analysis is an open one. When an otherwise practicable alternative site is not presently owned by the applicant, it may still be considered if it could be reasonably obtained, utilized, expanded, or managed in order to fulfill the basic project purpose. The 404(b)(1) Guidelines further direct that **if** the permit applicant establishes that no less damaging practicable alternative is available, the applicant **must then** show that all appropriate and practicable steps will be taken to minimize adverse impacts of the discharge or fill on the wetlands.

26.

Pursuant to a 1990 Memorandum of Agreement, the Corps and EPA have implemented a policy of no overall net loss of wetland values and functioning in carrying out their respective Section 404 responsibilities.  Under the Agreement, the Corps may only utilize compensatory mitigation if wetland losses cannot be avoided and unavoidable impacts are minimized to the maximum extent practicable.

27.

Section 404(b)(1) Guidelines also prohibit the issuance of a Section 404 permit if the discharge will cause or contribute to significant degradation of the waters of the United States.  "Significant degradation" includes significantly adverse effects on fish, shellfish, wildlife, and special aquatic sites.  "Significant degradation" also includes significantly adverse effects on life stages of aquatic life, as well as on aquatic ecosystem diversity, productivity, and stability.

28.

The Corps is also bound by law to complete a "public interest review."  Those regulations, found at 33 C.F.R. § 320.4, prohibits the issuance of a Section 404 permit if the District Engineer determines that it would be contrary to the public interest.  The Corps must weigh the benefits of the project against its reasonable foreseeable detriments, considering all relevant factors and their cumulative impacts.  Included among the factors to be considered are conservation, economics, general environmental concerns, wetlands, fish and wildlife values, water quality, and the general needs and welfare of the people.  The unnecessary alteration or destruction of most wetlands is per se contrary to the public interest.

29.

Under the Corps' public interest test, most wetlands constitute a productive and valuable public resource, and the unnecessary alteration or destruction of such wetlands should be discouraged.  Wetlands considered to perform functions important to the public interest include wetlands that are unique in nature or scare in quantity to the region or local area.  The public interest review also establishes general criteria that must be considered in the evaluation of every Section 404 permit application, including the relative extent of the public and private need for the proposed project, and the practicability of using reasonable alternative locations.

30.

Federal regulations also impose requirements of independent verification on important parts of the development process. 40 C.F.R. § 1506.5(a) requires that where an applicant submits environmental information for use in preparing a possible environmental impact statement, the agency receiving that information "shall independently evaluate the information submitted and shall be responsible for its accuracy." Further, 40 C.F.R. § 230.12(a)(3)(iv) provides another constraint upon the Corps' decision-making process. It instructs the Corps that a proposed disposal, fill, or discharge site be "specified as failing to comply...[when] there does not exist sufficient information to make a reasonable judgment about whether the proposed discharge will comply" with guidelines in place to aid consideration of biological, aquatic, and human use impacts of a proposed 404(b) permitted discharge site.

31.

When a project relies on the use of compensatory mitigation for the loss of aquatic resources, the Corps must adhere to the provisions set forth in 33 C.F.R. § 332.

Compensatory mitigation goals must be commensurate with the amount and type of impact that is authorized in a possible permit. This regulation requires that when the Corps is evaluating compensatory mitigation options, it must assess the likelihood for ecological success and sustainability of the compensatory mitigation project.

**C.    National Environmental Policy Act**

32.

NEPA is our nation's "basic charter for protection of the environment." Regulations promulgated by the Council for Environmental Quality ("CEQ") establish that NEPA's twin aims are to ensure fully informed decision-making and to provide for public participation in environmental analyses and decision-making. According to CEQ regulations, NEPA requires that high quality environmental information be available to public officials and citizens before decision are made and before actions are taken. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.

33.

NEPA requires federal agencies to prepare either an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") for major Federal actions significantly affecting the quality of the human environment, unless the proposed action fits within a pre-existing Categorical Exclusion ("CE") that allows the agency to bypass further NEPA analysis.  Where information for an EA is prepared by the applicant, the Corps must make its own evaluation of the environmental issues and take responsibility for the scope and content of the EA.

34.

NEPA requires adequate disclosure of all environmental effects, and specifically requires federal agencies to discuss the direct, indirect, and cumulative impact of proposed actions.  A "cumulative impact" results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of who undertakes the action.  Cumulative impacts can result from individually minor, but collectively significant, actions taking place over a period of time. Among the effects that must be considered are growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural ecosystems.

35.

NEPA also requires that an agency include in an EIS or EA a discussion of alternatives to the proposed action.  The agency must rigorously explore and objectively evaluate all reasonable alternatives, and for all alternatives that were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. The agency must also consider a No Action alternative, as a means to measure the environmental impacts of action alternatives.  This alternatives analysis is the "heart" of NEPA.

36.

A Finding of No Significant Impact ("FONSI") is a document in which the agency briefly explains the reasons why an action will supposedly not have a significant effect on the environment and an EIS will not be prepared.  An agency may not rely on mitigation measures to offset Project impacts, unless the agency discloses and evaluates the likelihood that those measures will be implemented, that they will work, and the environmental consequences of mitigation failure.

14 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

D.    **Endangered Species Act**

37.

Congress enacted the ESA to provide a means whereby endangered and threatened species may be conserved or protected.  The ESA is focused on protecting animal species that are listed as "endangered" or "threatened."  The National Marine Fisheries Service (NMFS) administers the ESA with respect to marine species, including the Pacific anadromous salmonid species that use the Skipanon River and are potentially affected by the Project.

38.

Section 7 of the ESA imposes consultation duties on federal agencies.  "Action agencies" (such as the Corps) must engage in consultation with NMFS ("consulting agency") if a proposed action may affect endangered or threatened species or critical habitat.  The permitting of activities impacting jurisdictional wetlands is an agency action subject to consultation.

39.

Pursuant to ESA implementing regulations, if a listed species may be present in the action area, the action agency must make a preliminary determination regarding effects. If the action agency decides that the proposed action may affect, but is not likely to adversely affect ("NLAA") listed species, it should engage in consultation.

40.

The ESA Section 7 consultation process is **not** the same as a NEPA, or CWA, or Corps Public Interest, analysis.  The ESA process looks at a different issue, specifically

whether a project will jeopardize the continuing existence of an entire listed species, rather than focusing on specific impacts at a specific location.

## VI. FACTUAL BACKGROUND

41.

The WalMart Project issue here is located in Warrenton, Oregon, a place where spectacular scenery, outdoor recreation, history, and friendly people all blend together to create a vibrant community. Warrenton is situated in the Northwestern tip of Oregon, between the Columbia River and Pacific Ocean, in Clatsop County.

42.

Wal-Mart's Project is planned for an area that has an existing wetland complex connected to a tributary of the Skipanon River. There even used to be a creek on the site.  The Skipanon River as a body of water is recognized as "water quality limited." Wal-Mart's Project is located east of Highway 101 and west of the Burlington Northern Railroad.  The area containing and surrounding the Project site has been developed in the past, leading to the prior fill of 0.9 adjacent acres of wetlands. The Project calls for the fill of an additional .37 acres of wetlands.

43.

Wal-Mart's basic project purpose is to construct a regional big box store.  The overall project purpose is to provide a contemporary retail opportunity for North Coast consumers.  To do this, Wal-Mart proposes to fill in the last remnants of a stream along with a wetland.  This particular site is preferred by Wal-Mart because it wants to create a big box store with the greatest visibility, adjacent to Highway 101 (the main north-south Highway on the Oregon Coast).

16 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

44.

In 2007 WalMart submitted or assisted with a request for a 404 permit for a wetland fill at a site owned by Warrenton Fiber/Nygaard (Application 2007-00745). A permit was ultimately issued for that site. Wetland fill was done, destroying over 14 acres of wetlands. However, WalMart subsequently changed its mind and decided to use a different site, the one now at issue.

45.

The wetlands that will be affected by the Project at issue perform many beneficial biological, chemical, and physical functions. Biologically, the wetlands support valuable wildlife and plant habitat and diversity. Chemically, these wetlands absorb and filter sediment, contaminants, and nutrients that would otherwise degrade the water quality of their associated tributary and by extension the Skipanon River. This river is already recognized as "water quality limited" for certain pollutants. Wetland vegetation absorbs phosphorous and nitrate by incorporating them into the plant tissue and then incorporating the plant tissue into the buildup of organic soils. The physical functions these wetlands perform include water storage, which delays and mitigates the effects of storm events.

46.

The Project will destroy .37 acres of vital wetlands, and will replace the currently existing ecosystem with parking lots, store space, and related facilities. The Project is adjacent to other development, and the project will most likely induce or contribute to future building in the area, all of which threaten and reduce the health of nearby aquatic networks of protected wetlands. Mitigation for the Project includes the purchase of .37

17 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

acres of In-Lieu Fee credits from the state's Lands In-Lieu Fee Program. This mitigation will do nothing to restore the salvific effects of the wetland complex on site, nor to address the cumulative effects of continued fill activity on the Skipanon River, a water of the United States.

47.

The Project site potentially effects the aquatic and biological resources of the Skipanon River. The wetland complex to be filled discharges into another wetland, and from there to the Skipanon, itself a tributary to the Columbia River.  The Skipanon is an important component of the Columbia River Estuary. Several species of anadromous fish are present in the Lower Columbia River and could potentially utilize the Skipanon, including Steelhead, Chum Salmon, Chinook Salmon, and Sockeye Salmon. The wetland fill foreseen by the Project plan is adjacent to a larger wetland fill undertaken previously, as part of a prior retail development.

48.

Despite the general nature of the project's purpose ("To construct a regional big box store"), the Corps considered only four alternatives to the proposed development. One of those was a "no action" alternative.  Although Wal-Mart's describes its Project's "market area" as the entire North Coast, (a large area of roughly 125 road miles north to south), no alternatives located outside of Warrenton were proposed or evaluated.  No alternative logistical arrangements for development--a Wal-Mart of compacted size, with a less invasive parking lot, or with greater distance from the highway, or located outside of Warranton, were evaluated.

18 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## VII. PROCEDURAL HISTORY OF CURRENT PROJECTS

49.

Wal-Mart, acting via intermediary Peaksview LLC, submitted a Joint Permit Application (State; NWP-2007-1024-1) to Defendant Army Corps.  The Corps issued a public notice of opportunity to comment on the Project on May 16, 2012.  A number of commenters expressed concerns about, or objections to, the project, including, but not limited to: prioritizing Highway 101 frontage over impacts to wetland complexes; impacts to aquatic functions and values; impacts to water quality; impacts to critical habitat; impacts to endangered/threatened species; impacts to traffic; impacts to the local economy; aesthetic concerns; recreation concerns; cumulative effects of piecemeal development; impacts to local infrastructure; and impacts from stormwater runoff.  A number of commentors requested a public hearing on the fill permit.  Notwithstanding these requests, and the controversial nature of the project, the Corps refused to hold a public hearing.

50.

On September 5, 2014, the Corps issued an EA, a 404(b)(1) Guidelines Evaluation, a Public Interest Review, and Statement of Findings for the Project, that included a FONSI.  The Corps asserted in its decision that the issuance of a Section 404 permit here would be lawful, consistent with its own regulations, and not potentially have a significant impact on the quality of the environment.

## FIRST CLAIM FOR RELIEF: CWA COMPLIANCE

51.

Plaintiffs re-allege paragraphs 1 to 50 and further alleges:

19 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

52.

In issuing the Section 404 permit, the Corps acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law, in one or more of the following ways:

(a)     In failing to comply with the requirement of 40 C.F.R. § 230.10(a) that no permit shall issue if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem;

(b)     In failing, during its considerations, to properly apply the 40 C.F.R. § 230.10(a)(3) presumption that due to the non-water dependent nature of the proposed development, practicable alternatives existed;

(c)     By failing to insist that the applicant provide alternative sites not located in Warrenton, despite the fact that such sites would potentially be less adverse to the environment while still meeting Wal-Mart's basic Project purpose;

(d)     By not properly reviewing and assessing the cumulative impacts of the prior fills, and the proposed fill, on the wetland complexes that would be effected;

(e)     By mistakenly relying on a NMFS NLAA finding, to substitute for a 404(b)(1) Guidelines impact analysis, when the two findings are not based on the same criteria and do not address and resolve the same issues;

(f)     By failing, in contravention of 40 C.F.R. § 1506.5(a), to consider alternative on-site configurations of a sufficiently smaller size that they would protect more wetlands, without frustrating the project purpose;

(g)     By issuing a Section 404 permit, notwithstanding 40 C.F.R. § 230.10(d), which provides that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem;"

(h)     By failing to adequately consider practicable alternatives in contravention of 40 C.F.R. § 230.10(a)(2), based on the full acceptance of Wal-Mart's unreasonably narrow Project preferences, including but not limited to a location adjacent to Highway 101, as determinative;

(i)     In failing to ensure that the issuance of a Section 404 Permit was not contrary to the public interest, in accordance with 33 C.F.R. § 320.4, when

20 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the facts here showed there were significant public interests at issue and the Corps did not consider all of them;

(j)    By accepting the applicant's exaggerated claim of public economic benefits from the Project, while also ignoring public comment and not providing a public hearing, when reaching a decision as part of the Public Interest Review on whether the "Needs and welfare of the people" will be more positively than negative;

(k)    By characterizing - in its Public Interest Review - the "General environmental concerns" as "neutral" despite (i) the non-equivalence of In-Lieu Fee mitigation, (ii) the potential harm to a former stream and wetland complex that was previously recognized as significant, and (iii) knowing that the increased impervious surfaces created by the Project - in combination with the prior permitted fills in the same complex - could result in adversely affected aquatic resources downstream;

(l)    By characterizing - in its Public Interest Review - the "Fish and wildlife values" as "neutral" despite knowing that the Project could potentially adversely impact fishery resources; and

(m)    Despite the Corps' Public Interest Review summary identifying 4 adverse effects, 23 negligible effects, 2 beneficial effects, and 6 neutral-due-to-mitigation effects, the Corps improperly deemed issuance of the Section 404 permit not contrary to the public interest.

53.

Pursuant to 28 U.S.C; § 2412 et seq., plaintiffs' seek attorney fees and litigation costs associated with pursuing this litigation.

**SECOND CLAIM FOR RELIEF: NEPA COMPLIANCE**

54.

Plaintiffs re-allege paragraphs 1 to 50 and paragraph 53 and further alleges:

55.

In issuing the EA and FONSI, the Corps acted in a manner inconsistent with NEPA and CEQ regulations.  The Corps conduct was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, or without observance of procedure

required by law in one or more of the following ways:

    (a)    In failing to adequately consider and take into account significance criteria set forth at 40 C.F.R. § 1508.27 in its decision to not prepare an EIS;

    (b)    In failing to acknowledge and address the degree to which the effects on the quality of the human environment are likely to be controversial, a stated NEPA review consideration under 40 C.F.R. § 1508.27(4), particularly in light of the considerable public opposition to the permit approval in comments and an acknowledge "split" in local citizen opinions according to local press;

    (c)    In failing to evaluate the degree to which the effects on the quality of the human environment are likely to be controversial in light of the wetland complex's relation to important aquatic infrastructure and resources in the region;

    (d)    In failing, given past fills near Project site and the acknowledge likelihood of future development adjacent to or near the site, to evaluate properly the Retail Development's direct, indirect, and cumulative impacts, including reasonable foreseeable future actions and impacts, in violation of 40 C.F.R. §§ 1508.7, 1508.8, & 1508.25(c);

    (e)    By improperly limiting the alternatives analysis, and in doing so failing to fully comply with 40 C.F.R. § 1502.14 (which explains that the consideration of alternatives section is at the heart of environmental analysis, and that the agency should present the environmental impacts of the proposal and the alternatives in comparative form in order to "sharply [define] the issues and [provide] a *useful* basis for choice among options by the decision maker and ... public) (emphasis added);"

    (f)    In failing to fully comply with 40 C.F.R. § 1502.14 by giving inadequate weight for purposes of NEPA in considering alternatives, in conjunction with other essential considerations of national policy, outlined in Section 101 of NEPA;

    (g)    In failing to properly described a true "No Action Alternative" as required by 40 C.F.R. § 1502.14(d), by failing tomention and account for the fact that non-Warrenton development options would still allow Wal-Mart to achieve its overall Project purpose;

    (h)    In failing to adequately consider and take into account the nature and extent of growth inducing effects of a new Wal-Mart, which would potentially endanger "significant" wetlands close to the Project site, increase traffic, noise, and pollution, negatively effect native plant

22 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

diversity, cause further natural habitat fragmentation, increase stormwater runoff, and potentially introduce additional invasive species;

(i)     In failing to conduct any meaningful analysis related to climate change, despite NEPA's requirement that the agency disclose and consider both the climate change impacts that result *from* the Project and the impacts of climate change *on* the Project;

(j)     In failing to set forth an accurate environmental baseline, in contravention of 40 C.F.R. § 1502.15; and

(k)     In failing to prepare an EIS, despite the potential significant effects to the quality of the human environment.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Declare that the Corps violated the Clean Water Act and/or its

implementing regulations when it issued a Section 404 Permit;

B.      Declare that the Corps violated the National Environmental Policy Act

and/or CEQ regulations when it issued a final decision, EA and FONSI;

C.      Set aside and remand the Corps' decision to issue the Section 404 permit;

D.      Award to Plaintiffs their costs, expenses, expert witness fees, and

reasonable attorney fees associated with this ligation pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412; and,

E.      Grant plaintiffs such further relief as may be just, proper, and equitable.

 Respectfully submitted this 30th day of April 2015.

LAW OFFICE OF KARL G. ANUTA, P.C.


*/s/Karl G. Anuta*
KARL G. ANUTA (OSB No. 861423)
kga@integra.net
Attorney for Plaintiffs and Trial Attorney